## DUNCANSON v. McLURE.

### Title to vessel.—Illegal contarct.

An agreement for the sale of a ship, at a future day, the purchase-money being secured, is an immediate transfer of the title.

Murgatroyd v. Crawford, 3 Dall. 491, overruled.

One whose title to a vessel depends on a contract in fraud of the registry laws of the United States, cannot maintain trover for the same.

THIS was an action of trover for the ship Mount Vernon, which the defendant had purchased, under a sentence of condemnation as prize, pronounced by the French Provisional Tribunal of Prizes, established in the city of St. Domingo. The material facts of the case were these : (a)

Mr. Duncanson, an English gentleman, came to the United States with a view to settle ; and in order to manifest his intention, took an oath of allegiance to the state of Pennsylvania, though he had not been long enough in the country to entitle himself to naturalization, under the act of congress. Contemplating a circuitous voyage from America to England, and thence to the East Indies, he applied to Messrs. Willings & Francis, to procure a ship for him ; and those gentlemen agreed absolutely with Mr. Thomas Murgatroyd, for the purchase of the ship Mount Vernon, owned by him ; the bill of sale being made out, and delivered to them, upon terms of payment precisely ascertained. It, then, however, occurred to Mr. Duncanson, that as he had not yet acquired the rights of American citizenship, he could not enjoy the advantages which he proposed to derive from his projected voyage. For the trade from England to the East Indies is, by the law of that kingdom, a monopoly ; no British subject can, individually, embark in it, without incurring a forfeiture of his vessel and cargo ; though it has recently been adjudged in England, that an American citizen is entitled to carry on the trade, by virtue of express stipulations in the treaty of amity and commerce between the United States *and Great Britain. (b)

*309] Hence, it was deemed necessary to enter upon another operation. The bill of sale was sent back, and a new contract was formed between the parties, upon these principles : that Mr. Murgatroyd should remain the

---

(a) This introductory statement of the facts is transcribed from the charge of the court, in the action brought upon a policy of insurance, on the Mount Vernon. 3 Dall 491. Upon more mature consideration, the opinion there delivered was overruled in the present cause, by the same court ; and was virtually condemned in the circuit court of the United States, where an action of replevin had been first instituted in the name of Murgatroyd v. McLure. See post, p. 342. The name of Mr. Duncanson was now used without his knowledge or consent, for the benefit, it was suggested, of the underwriters, who had paid a total loss, under the former decision, and Messrs. Willings & Francis, who were in advance for the outfits of the ship. It was objected, that the names of the real parties should appear on the record ; but the objection was not sustained by the court.

(b) See Wilson v. Maryatt, 8 T.·R. 31.

Juncanson v. McLure.

owner of the ship, and as such retain the register and make the insurance ;(a) that she should, however, be delivered to Mr. Duncanson or his agents ; that Messrs. Willings & Francis should procure a freight for her on Mr. Duncanson's account ; that Mr. Murgatroyd should empower Mr. Skirrow (a gentleman who went as a passenger) to assign and transfer the ship to Mr. Duncanson, in England, on the 1st of September ensuing, at which time Mr. Duncanson would be duly naturalized as an American citizen ; and that the consideration-money should be secured by the notes of Messrs. Willings & Francis, payable, at all events, in certain instalments.

The Mount Vernon sailed from Philadelphia, on the 10th of June 1796, with the usual documents of an American vessel. As soon as she had cleared the capes of the Delaware, she was boarded and taken possession of by " the Flying Fish," a French privateer, and carried into the port of St. John, in the Spanish island of Porto Rico. While she remained there, the ship and cargo were libelled by the captors, in the Provisional Tribunal of Prizes, at the city of St. Domingo, in the island of St. Domingo ; a court establishes by the republic of France in that city, for the determination of questions of prize. And on the 30th of August 1796, after various proceedings, the following sentence was pronounced, by the court:

" Thirteenth Fructidor, Fourth year.
Condemnation of the English ship Mount Vernon.

Extract from the books of the office of the provisional tribunal respecting prizes, established in St. Domingo.

We, Francis Pons, judge of the provisional tribunal respecting prizes established in St. Domingo, having looked over our sentence of the seventh Thermidor last, where all the papers exhibited by citizen Nadal, captain of the privateer Flier, against the ship Mount Vernon, are duly noticed, through which we had submitted the decision of this prize to the civil commission of Guarico, which applies again to our tribunal for pronouncing sentence of this subject ; having noticed also instructions which were officially given us by the citizen agent of the French Republic in this city, issued by the civil commission aforesaid, in whose archives they have been duly recorded, *from which it appears, first, that the papers having [*310 been thrown into the sea by the captain, in sight of the privateer which captured him, secondly, that the captain and supercargo having precipitately abandoned their ship, in spite of the good treatment received by them from the French captain, and the hints he gave them about remaining there, in order to plead their own cause, and thereby avoid her confiscation, thirdly, the behavior of the captured crew, fourthly, the captain being a Portuguese, without a certificate of his naturalization, fifthly, that the United States, in the last treaty which they concluded with England, having suffered to be added to the articles which have been looked upon till at present as contraband of war, staves, tackles, sail-cloth, iron-hoops, and finally all which can be made use of for vessels,

---

(a) The premium of insurance, however, was paid by Mr. Duncanson ; the ship actually sailed on the voyage insured at his risk ; and the recovery against the underwriters (3 Dall. 491) was applied to the reimbursement of the purchase-money, paid by Messrs. Willings & Francis, on account of Mr. Duncanson.

Duncanson v. McLure.

are sufficient motives to condemn said ship; after a serious examination we have judged and do judge that the ship Mount Vernon, captain George Dominico, Portuguese, with her cargo, has been duly and justly captured by the French privateer, commanded by citizen Nadal, to whom we adjudge her as property belonging to him, and of which he may dispose under the clauses and conditions made with his officers and crew, he being accountable for the duties of invalids and the costs of the tribunal, which he shall pay to the bearer of our notary's order. Santo Domingo, Fructidor thirteenth (August thirtieth), fourth year of the French Republic, one and indivisible. Signed in the register, Pons, Judge, and Despujeaux, Notary-public.

  (Signed)           Pons, Judge.
  Depujeaux, Notary."

Under this sentence of condemnation, the Mount Vernon and her cargo were delivered to the captors, by the Spanish governor of Porto Rico, with permission to sell them there. At the public sale, Rousseau, a naturalized American, purchased the ship; and afterwards sold her for $22,000 to McLure, the present defendant, an American citizen, who brought her to Philadelphia. A replevin was then issued for the ship, in the name of Murgatroyd, from the circuit court for the Pennsylvania district; but it appearing on the trial, that Murgatroyd had received payment of all the notes, which Messrs. Willings & Francis gave for the purchase-money, the court declared, that he had no property in the ship, to maintain a replevin; and directed a nonsuit. In consequence of that defeat, the present action of trover was brought in the name of Mr. Duncanson.(a)

The cause was argued, at great length, upon the following general points :(b)

*311] *1st. Whether the ship Mount Vernon, at the time of her sailing and capture, was the *bona fide* property of Murgatroyd, a citizen of the United States; or was only registered and held in his name, in trust for Duncanson, an alien.

2d. Whether the capture of the Mount Vernon was a lawful, or a piratical act; considering the commission of the privateer, and the circumstances of the capture.

---

(a) *Post*, p. 349.

(b) The trial of the cause first came on, in March term, 1804; but after all the evidence was heard, and part of the arguments of counsel, some of the jury stated to the court, that they felt themselves embarrassed from the declaration of three of their brethren, " that consistently with their religious principles, and conscientious scruples, they could not, under any circumstances of proof, or any course of reasoning, find a verdict in favor of the party, who claimed the ship, under a condemnation as prize of war." It was wished, on both sides, to reconcile the objecting jurors to the discharge of a public duty, in which their consciences ought to be governed by the law of the land, and not by personal considerations: but every effort being ineffectual for that purpose, the court observed, that they could not, on the one hand, exercise the oppression of coercing a juror to act in contradiction to his real religious and conscientious scruples; nor on the other would they expose the defendant to the consequences of a trial, in which he might lose, but could not possibly obtain a verdict. Lamenting that so much time had been consumed before notice of the objection, the court directed a juror to be withdrawn.

# OF PENNSYLVANIA.

## Duncanson v. McLure.

3d. Whether the French court, established at St. Domingo, was a competent tribunal, to decide, in this case, the question of prize or no prize ; the city of St. Domingo then belonging to Spain, or not being surrendered to France ; the ship lying in a Spanish port, at another island, belonging to Spain ; and the United States being at peace both with France and Spain.

In relation to these points, the *plaintiff's* counsel contended :

1. That the property of the Mount Vernon continued in Murgatroyd, until the power was executed by Skirrow ; or, at least, until the last of the instalments of the purchase-money was actually paid ; that the execution of the power, being prevented by superior force, capture and detention, ought not to affect the original rights and interests of the parties ; that the contract with Duncanson was merely executory (a species of contract recognized by the law), and until the specified event had actually occurred, to wit, an arrival in England, and a transfer by Skirrow, no property could vest; and that there was no fraud upon belligerent rights, no violation of neutral duties, in the formation or affirmance of such a contract. 2 How. on Contr. 79 ; 3 Dall. 491 ; Adm. Inst. 218 ; 2 Journ. Cong. 114 ; 3 Rob. 24, 31, 39 ; Treaty between the United States and France, 1778 (8 U. S. Stat. 6), art. 6, 15, 21, 23.

2. That the capture of the Mount Vernon was piratical ; for it is piracy, not only when a man robs without any commission at all, but when, having a commission, he despoils those whom he is not warranted to fight, or meddle with ; such as are in alliance *or friendship with that state which has given him his commission. (2 Woodes. 422.) That at the time of [*312 the capture, the United States and France were in alliance and friendship ; and therefore, it was piracy, even in a French commissioned vessel to seize, spoliate and sequester American property. And that, whenever the piratical taking is succinctly ascertained, it becomes a clear and indisputable consequence, that there is no transmutation of property ; no right to the spoil vests in the piratical captors ; no right is derivable from them to any recaptors, in prejudice of the original owners. (Ibid. 429–9.)

3. That capture, without condemnation, does not work a change of property. (2 Burr. 693 ; 2 Dall. 5.) That a condemnation, to be lawful, must be pronounced by a court of the captor, in the country of the captor, or of a co-belligerent. (1 Rob. 114 ; Sir Wm. Scott and Mr. Nicholl's letter to Mr. Jay.) That neither the island of Porto Rico, to which the ship was carried, nor the city of St. Domingo, where the condemnation was pronounced, belong to the country or jurisdiction of the captor; nor were France and Spain allies in the war, at the time of the capture. (5 vol. Debr. Col. Stat. Pap. 18–21.) That foreign judgments may be inquired into, wherever the court pronouncing them has not jurisdiction of the subject, on principles of the law of nations, as well as on principles of the common law. (2 Str. 1078 ; Doug. 1 ; Park 353 (4 edit.); 1 Rob. 114 ; 3 Dall. 15 ; 2 Rob. 174 ; 3 Ibid. 53 ; 3 Ibid. 82; Doug. 555 ; Park 363 ; 7 T. R. 523 ; 2 Show. 232 ; 1 Emerig. 232, 438.

In relation to the general points of the cause, the *defendant's* counsel contended :

1. That the case exhibits a manifest violation of the registering act ; and

militates against the duty of a neutral character, by masking the real property of a belligerent alien. That the act of congress not only prohibits all open avowed ownership of an alien, in a registered vessel of the United States; but every species of secret or latent ownership in the ship, and her issues and profits, "by way of trust, confidence or otherwise." (1 U. S. Stat. 287, § 1, 2, 4, 7, 16; Ibid. 56, § 6.) That an ownership in trust, could never be more strongly characterized; for the ship was bought for him, and the price was paid by him, through his agents; she was insured at his charge; she sailed at his risk; and an agent named by him was possessed of an absolute power to transfer her to him. That the contract was not executory, in the sense contended for; as the intention was to pass an immediate right of property, an absolute usufructuary enjoyment, keeping back the formal title only, for a specific unlawful purpose; as there was no covenant to convey, depending on any event, but an absolute power and *313] mandate to transfer; as there was no mutuality, the price being payable, at all events, *and Murgatroyd was never again capable of sharing in the profit or loss of the ship. That the property was so changed, at the time of sailing, that the ship would have been liable, as Duncanson's, to execution and attachment, and to the statutory assignment of the insolvent or the bankrupt law. That if such a mask could secure impunity, in violating the registering act, aliens, and particularly belligerent aliens, would soon be the owners of a great portion of the American tonnage. *Maybin* v. *Coulon* (*ante*, p. 298), 5 T. R. 112; 3 Dall. 495; 3 Rob. 243, note *a*; 4 Ibid. 91, 93, 95. That, indeed, in every aspect of the cause, an American common-law court ought not to interpose; not, if it is a breach of our navigation laws; not, if it is a cover of belligerent property; not, if Duncanson is an Englishman; and not, if it is a question of prize, which is exclusively of admiralty cognisance. 2 Rob. 111, 114; Wesk. 359; 1 Mag. 437; 3 Rob. 269; 2 Dall. 165; 4 T. R. 382; 3 Dall. 6; 3 Ibid. 25, 32; 7 T. R. 696; 8 Ibid. 444; Park 71; 2 Dall. 4; 2 Burr. 693–4; 2 Dall. 270.

2. That the capturing privateer had a lawful commission from the French republic; captured the Mount Vernon as prize, on the high seas; and sent her for adjudication to a court, established by the nation of the captor. Such a capture may be tortious, but it can never be piratical. In the present instance, however, the appearances, at the time, and the result of subsequent investigation, must equally justify the proceeding: for it is now notorious, that the Mount Vernon was an English owned ship, going to a belligerent port, and with false papers, describing a false destination. If, then, Duncanson was the owner of the ship, and was an enemy of France, who had not acquired the rights of neutral domicil, the capture was lawful; and the courts of this country could not interfere, before condemnation; nor, *à fortiori*, can they interfere, after condemnation and sale. (Vatt. lib. 3, c. 14, § 208, p. 583.)

3. That the city of St. Domingo was either to be considered as belonging to France, under the cession of the treaty between her and Spain; or as the country of Spain, an ally of France, on the eve of engaging in the war against Great Britain. (Treaty of 22d July 1795, art. 9.) That the French constitution had regarded the cession as complete, and the legislature of France had actually divided the Spanish side of St. Domingo into departments. (Const. art. 3.) That Great Britain, in her manifesto, had also

considered the cession from Spain to France as absolute. (New Annual Reg. p. 121, 1796.) That a recurrence to dates will satisfactorily show the relative situation of France, Spain and England, on the co-operation of the two former in hostilities against the last. Thus, the Mount Vernon was taken on the 9th of June, carried into Porto Rico on the 4th of July, condemned at St. Domingo on the 30th of August, sold on the 26th of October *1796, and kept under embargo until the 27th of May 1797. A treaty [*314 of alliance between France and Spain was signed on the 19th of August, and ratified on the 6th of September 1796, in which a joint war with England is contemplated ; and accordingly, on the 5th of October 1796, Spain published a declaration of war. Thus, when the Mount Vernon was captured and condemned, France and Spain were in alliance, with a view to a war against England ; and the joint war was actually declared and waged, while the ship remained within the territory and power of the allies. That, independently of the question of alliance and hostility, neither the place of condemnation, nor the place where the ship lay, can avail the plaintiff, if Spain permits and England does not complain. That the institution of courts for prize causes, in countries not belonging to the captors, nay, in neutral countries, has been practised, as well as recognised by England ; and has been practised as well as recognised by America. 2 East 473 ; 2 Rob. 174 ; 4 Ibid. 34–5, 44 ; Carth. 474 ; 2 Danv. Abr. 269, pl. 8 ; 2 Brownl. 11, 29 ; Godb. 386 ; Park 353 ; 5 vol. Journ. Cong. 440 (30th Nov. 1779), Cochin. 708.

THE COURT delivered a long and elaborate charge to the jury, on the two principal points in the cause. 1st. They expressed considerable doubt, whether the condemnation of the Mount Vernon was pronounced by a competent court ; inasmuch as the ship was not within the jurisdiction of the country of the captors ; as the evidence did not satisfactorily prove, that France had taken possession of St. Domingo, in pursuance of the treaty of cession ; and as Spain and France did not appear to be actually allies in the war, at the time of the capture and condemnation.(a) 2d. But they were clearly and decidedly of opinion, that the charge delivered in the case of *Murgatroyd* v. *Crawford* (3 Dall. 491), was erroneous and untenable. Acknowledging and retracting, therefore, with candor, the error which they had then committed, they declared, that the verdict must be in favor of the defendant ; inasmuch as the plaintiff's claim to the ship was founded upon a transaction, in fraud of the positive laws and public policy of the United States, which exclude an alien from any degree of interest in an American registered vessel, by way of trust, confidence or otherwise.

Notwithstanding the explicit decision and direction of the court, one of the jurors refused, during four days, to concur in a general verdict for the defendant ; declaring, in open court, " that although he stood alone, he would only lay down his opinion with his life : for he never could consent to cast the property of the ship upon the defendant, through the medium of such a

---

(a) In Baring v. Clagett, 3 Bos. & Pul. 201, which was an action on a policy of insurance, on this ship, warranted American, it was held, that the sentence of the French court, at St. Domingo, was conclusive evidence that the ship was not American.

capture and condemnation." At length, the form of a special verdict was submitted to the jury, by each side ; and the jury adopted and returned the form prepared by the defendant's counsel.

*315]     *When the special verdict was brought before the court, for argument, at December term 1804, the defendant moved for a new trial, on the ground, that although the facts were sufficiently found, for a judgment, on the point of a breach of the acts of congress ; they were not sufficiently found, to enable this court, or the high court of errors and appeals, to decide upon the objections to the condemnation, because St. Domingo was Spanish territory, within which a French prize court was not competent to act ; and because the ship was not within the jurisdiction of St. Domingo, but at Porto Rico, when she was condemned. Besides, in an action of trover, the jury are bound to give the actual value of the property, if they find for the plaintiff ; and in this case, they have given only prime cost of $22,000 on the sale to the defendant ; whereas, the value, according to the only evidence before the jury, was $40,000.

After repeated arguments, THE COURT determined that the facts were not sufficiently found, on the whole case ; and although they adhered to their opinion, as delivered in the charge, in justice to the plaintiff, who had a right to a writ of error, as well as in consideration of the importance of the decision, it became necessary and proper to award—

A new trial. (a)

---

(a) YEATES, Justice, thought that enough was found, upon the special verdict, to give judgment for the defendant, on the paramount and controlling question of a violation of the acts of congress. He was, therefore, opposed to a new trial, though the facts on the other questions were, he admitted, defectively found, and though he did not approve of the estimate of the damages, for which no evidence had been adduced at the trial. SMITH and BRACKENRIDGE, Justices, however, pronounced the decision of the court.